## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Donna Louise DuPree,

        Plaintiff,

v.

Dr. Patricia Burke,

        Defendant.

No. 20 C 4889

Honorable Nancy L. Maldonado

## MEMORANDUM OPINION AND ORDER

Pro se Plaintiff Donna Louise DuPree initiated this civil rights lawsuit pursuant to 42 U.S.C. § 1983 claiming that she received inadequate medical care when she was a pretrial detainee at Kane County Adult Justice Center. DuPree alleges that Defendant Dr. Patricia Burke violated DuPree's rights under the Fourteenth Amendment's Due Process Clause by wrongfully denying DuPree surgery for a rectocele and pelvic organ prolapse, which caused her condition to become more painful. Dr. Burke has now moved for summary judgment, arguing that: (1) DuPree's diagnosed condition was not an objectively serious medical condition; (2) Dr. Burke provided objectively reasonable treatment; (3) DuPree lacks verifying medical evidence that Dr. Burke's alleged delay in treatment caused her any harm; and (4) punitive damages are inappropriate. (Dkt. 58.) For the reasons stated below, the Court grant's Dr. Burke's motion for summary judgment. In short, while the Court concludes there is a genuine dispute of fact as to whether DuPree was suffering from an objectively serous medical condition, the Court also concludes that DuPree has failed to come forward with sufficient evidence from which any jury could conclude that Dr. Burke's treatment was objectively unreasonable, or that any delay in treatment caused an independent harm. Dr. Burke is therefore entitled to summary judgment.

**Background**

**I.      Northern District of Illinois Local Rule 56.1**

Before providing the factual record on summary judgment, a brief note on the local rules governing summary judgment practice is warranted in light of DuPree's pro se status and her failure to comply with those rules.

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this court. The rule is intended "to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information, in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (cleaned up). Local Rule 56.1(a) requires the moving party to provide a statement of material facts that complies with Local Rule 56.1(d). N.D. Ill. Local Rule 56.1(a)(2). Local Rule 56.1(d) requires that "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it. The court may disregard any asserted fact that is not supported with such a citation." N.D. Ill. Local Rule 56.1(d)(2).The opposing party must then respond to the movant's proposed statements of fact. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); N.D. Ill. Local Rule 56.1(e). In the case of any disagreement, "a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." N.D. Ill. Local Rule 56.1(e)(3). "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003).

DuPree is proceeding pro se and so Dr. Burke served her with a "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment" as required by Local Rule 56.2. (Dkt. 61.) DuPree responded by filing a response to Dr. Burke's Statement of Facts (Dkt. 74), a Statement of Additional Material Facts (Dkt. 73), and a memorandum opposing the motion (Dkt. 72). Dr. Burke then responded to DuPree's Statement of Additional Material Facts. (Dkt. 78.)

DuPree's filings fail to comply with Local Rule 56.1 in many respects. For example, DuPree responded to many of Dr. Burke's factual statements by stating that she had insufficient information to admit or deny the statements. (*See, e.g.*, Dkt. 74, ¶¶ 5–8, 21, 34, 38, 40, 43, 46, 51, 72-73.) But this is not a proper response under the Local Rules, as all asserted facts must be either admitted or denied, in whole or in part. *See* N.D. Ill. Local Rule 56.1(e)(2). While a party is free to raise objections in their response, such as an objection that the asserted fact lacks support or is based on inadmissible evidence, a party must still indicate whether they admit or deny the fact notwithstanding the objection or they risk waiving any dispute. *See id*. ("In the event that the objection is overruled, the failure to admit or dispute an asserted fact may constitute a waiver."). Separately, DuPree's factual assertions in her Statement of Additional Material Facts (Dkt. 73) fail to comply with the Local Rules in that the Statement does not consist of numbered paragraphs, mixes argument with factual assertions, and does not cite to the record. DuPree's responses to Dr. Burke's Statement of Material Facts, while they are in numbered paragraphs, suffer from many of the same flaws, as DuPree attempts to assert additional facts in her responsive statement.

The Court notes that it enjoys broad discretion to require strict compliance with Local Rule 56.1, or to relax the rules and excuse noncompliance. *Edgewood Manor Apartment Homes, LLC v. RSUI Indem*. Co., 733 F.3d 761, 770 (7th Cir. 2013). Further, while pro se litigants are entitled to some flexibility, they are not excused from following the local rules. *See, e.g., Coleman v.*

*Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011) (nonprecedential) ("Though courts are solicitous of pro se litigants, they may nonetheless require strict compliance with local rules"). Ultimately, the Court will excuse DuPree's failure to comply with the technical formatting requirements in the local rules and will consider the additional facts identified by DuPree in her statements to the extent they are supported by the record, or if she could properly testify to them. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (noting a district's entitlement to take a "flexible approach" and construe a *pro se* submission leniently). On the other hand, where DuPree has not properly responded to one of Dr. Burke's asserted facts, the Court will deem the fact admitted and accept it as true to the extent it is supported by the record. *See Lamz*, 321 F.3d at 683 (7th Cir. 2003).

Finally, the Court notes that it is also mindful that failure to strictly comply with Local Rule 56.1, or indeed to respond at all to a motion for summary judgment, does not automatically warrant judgment in favor of the moving party. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006) (moving party has "ultimate burden of persuasion" to show entitlement to judgment as a matter of law). The Court will apply these standards in evaluating the evidence and factual record below.

## II.    Factual Background

Except as otherwise noted below, the following represents the undisputed facts as presented in the parties' Local Rule 56.1 statements. Where the facts are disputed, the Court indicates each side's position.

DuPree is a former detainee at the Kane County Adult Justice Center who was detained there intermittently from 2012 to 2013, 2013 to 2014, and in 2016, 2017, 2018, and 2019. (Dkt. 59 ¶ 2.) Dr. Patricia Burke is a physician who formerly worked at the Kane County Adult Justice

Center from September 2017 to June 2020. (*Id.* ¶ 3.) Dr. Burke obtained her undergraduate degree from the University of Chicago and her medical degree from the Yale School of Medicine. (*Id.*) She is licensed in Illinois and is board certified in internal medicine and geriatrics. (*Id.*) Dr. Burke has decades of experience treating internal medicine complaints. (*Id.*) Dr. Burke consulted on Dupree's medical treatment more than two dozen times over the course of DuPree's detention at Kane County Adult Justice Center, from March 22, 2018 to June 20, 2019, when DuPree was ultimately transferred to the custody of the Illinois Department of Corrections. (*See id.* ¶¶ 10, 74.)

At the outset, the Court notes that not all of Dr. Burke's treatment of DuPree during her detention period is relevant to this lawsuit. The parties' statements of fact and the medical records from DuPree's treatment indicate that DuPree has an extensive medical history with a number of chronic conditions, and that Dr. Burke treated Dupree with respect to a number of these other issues during her detention. But DuPree's operative second amended complaint only specifically raises claims related to Dr. Burke's treatment of DuPree's rectocele and pelvic organ prolapse, and the lack of surgery for those medical issues. (Dkts. 16, 17.) Now, however, DuPree apparently seeks to broaden the scope of her claims to include other aspects of her treatment. For example, throughout both her response to Dr. Burke's statement of facts and her responsive memorandum, DuPree raises numerous other complaints about Dr. Burke's treatment decisions concerning other medical conditions, including DuPree's sleep apnea, back, hip, and neck pain. (*See, e.g.*, Dkt. 74. ¶¶ 19, 20, 22, 23, 56, 57, 61, 64, 68. 69.) But DuPree cannot amend her complaint to expand her claims of mistreatment in response to a summary judgment motion. *See Prakel v. Indiana*, 100 F. Supp. 3d 661, 671 (S.D. Ind. 2015) (citing *Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir. 1996)). Rather, the scope of DuPree's claims is limited to what she pled in her second amended complaint, which only mentions Dr. Burke's treatment of her rectocele and pelvic organ prolapse.

5

The Court has therefore focused its discussion of the factual record on Dr. Burke's treatment of DuPree as it relates to the conditions at issue, i.e. her rectocele and pelvic organ prolapse, and the Court has limited its discussion of DuPree's unrelated treatment and medical concerns, providing details only as is necessary for context.

## A. Medical Care for DuPree's Rectocele/Pelvic Organ Prolapse.

### 1. Diagnosis and Initial Treatment Between July 14, 2018, and August 13, 2018.

Dr. Burke first saw DuPree on March 22, 2018, and treated DuPree ten times between March 22 and July 9, 2018, though it is undisputed that none of these visits involved care for a pelvic organ prolapse of any kind, and that DuPree did not report that she was experiencing symptoms of pelvic organ prolapse during any of these initial ten examinations. (*See id.* ¶¶ 10–28.) Then, on July 14, 2018, nurses advised Dr. Burke (who was not on site at the time) that DuPree had been brought to the clinic for a medical assessment of a suspected prolapsed uterus that was reportedly very painful. (*Id.* ¶ 29.)[1] Dr. Burke ordered that DuPree be taken to the local emergency room via ambulance. (*Id.*)

At Northwestern Delnor ER, DuPree was found to have minimal prolapse that was noted as occurring only when she was sitting upright. (*Id.* ¶ 30.) When DuPree was flat, Northwestern treaters found no prolapse, ulceration, or erythema (reddening of the skin). (*Id.*) The medical providers at Northwestern assessed DuPree with a Grade 1 uterine prolapse that was reducible, meaning that it could be put back into place, and noted that the area around the prolapse was not "significantly tender." (*Id.*) The ER physician advised that DuPree should be referred for a follow-up with an obstetrician-gynecologist and ordered a clear liquid diet for four days. (*Id.*) DuPree contends that Dr. Burke knew or should have known that the prolapse would get worse with daily

---

[1] Uterine prolapse is when the uterus is not properly supported and falls into the vagina. (*Id.* ¶ 9.)

activities and should have consulted with the ER doctor as to what could be done to prevent the prolapse from getting worse. (*Id.*; *See also* Dkt. 74 ¶ 30.)

On July 15, 2018, Nurse Kamila Adamowicz notified Dr. Burke that DuPree had elevated blood pressure, felt shaky, and was complaining of the high sodium content in the liquid diet ordered by Northwestern. (Dkt. 59 ¶ 31.) Dr. Burke ordered that DuPree be given a soft diet with supplemental protein shakes rather than the liquid diet. (*Id.*) Later that day, Dr. Burke received another report that DuPree reported experiencing vaginal bleeding and abdominal pain when she tried to pass stool. (*Id.*) Nurse Adamowicz noted a scant amount of blood on the wall of DuPree's vagina and assessed DuPree as having a visible uterine prolapse. (*Id.*) Dr. Burke ordered that DuPree be provided with lubricating jelly, bed rest, Ibuprofen, and Tylenol, and that an appointment with Dr. Burke be scheduled for the next day. (*Id.*)

The next day, on July 16, 2018, Dr. Burke examined DuPree. (*Id.* ¶ 32.) Dr. Burke reviewed the history of bowel complaints and pelvic prolapse, which DuPree identified as uterine prolapse. (*Id.*) DuPree had been given Milk of Magnesia, and reported that she was no longer straining at stool, but that her stools were becoming loose. (*Id.*) DuPree reported that she could urinate well and was not incontinent. (*Id.*) According to Dr. Burke, DuPree requested a consultation with Dr. Shyamani, DuPree's prior physician in Elgin, Illinois, because Dr. Shyamani had allegedly told her that if "this" occurred again, DuPree would need a hysterectomy. (*Id.*) Upon examination, Dr. Burke noted a bulge at the vaginal entrance and slight blood on the lateral vaginal wall. (*Id.*) As Dr. Burke tried to reduce the mass, it caused DuPree some discomfort and the tissue fell immediately. (*Id.*) Dr. Burke explained that she did not feel a firm body, which would be characteristic of the uterus, which is what DuPree believed had prolapsed. (*Id.*)

Based on her examination, Dr. Burke diagnosed DuPree with a Grade 2 prolapse of the

vagina or uterus with mild bleeding. (Dkt. 59 ¶ 33; *see* Dkt. 68 at 49.) Dr. Burke prescribed Tylenol # 3 and Nortriptyline, and planned to arrange for care from a gynecologist promptly. (*Id.*) While DuPree disputes that she received gynecological care promptly, it is undisputed that she was eventually seen by a gynecologist on August 6, 2018, as will be detailed further below. (*See* Dkt. 74 ¶ 33.)

Dr. Burke separately searched online for Dr. Shyamani and learned that the doctor was an internal medicine doctor, not a gynecologist. (Dkt. 59 ¶ 34.) Dr. Burke spoke to Dr. Shyamani, who indicated they had never treated DuPree for a prolapse, but instead reported that DuPree had a rectocele repair by a different physician, Dr. Guske, in Hoffman Estates. (*Id.* ¶¶ 34–35.) A rectocele occurs when the rectum prolapses into the back of the vaginal wall. (*Id.* ¶ 9.) DuPree had never reported to Dr. Burke or anyone at Kane County that she had a rectocele repair prior to incarceration. (*Id.* ¶ 35) Dr. Burke concluded that DuPree's symptoms were compatible with DuPree having a rectal prolapse into the vagina (i.e., a rectocele). (*Id.*) Dr. Burke noted in her examination records that Kane County would contact Dr. Guske. (*Id.*)[2]

Dr. Burke examined DuPree again on July 20, 2018. (Dkt. 59 ¶ 37.) DuPree reported relief from a soft diet but complained of constipation and vaginal bleeding, including having passed a clot that morning. (*Id.*) On examination, Dr. Burke found DuPree more comfortable than in prior visits that week. (*Id.*) Dr. Burke's medical assessment was vaginal bleeding with cramps, a history

---

[2] DuPree denies telling Dr. Burke that Dr. Shyamani had told her that if "this" re-occurred, she would need a hysterectomy. (See Dkt. 74 ¶ 32.) DuPree also appears to dispute that she never told Dr. Burke about her prior rectocele. In her response to Dr. Burke's statement of facts on this point, DuPree states that she lacks sufficient information to respond, which the Court noted above is not a proper means of disputing a fact. DuPree attempts to go further in her responsive brief, claiming that she affirmatively told Dr. Burke about her rectocele surgery with Dr. Guske at her first appointment on March 22, 2018; but the medical records from the visit on which she relies do not clearly support that claim, and only mention treatment for a lower bowel obstruction. (*See* Dkt. 72 at 20; *see also* Dkt. 68 at 56.) The Court could thus deem the fact that she never reported the rectocele as admitted, given that DuPree has not properly disputed the fact. In any event, the question of whether she reported the prior issue, even if disputed, would not change the outcome and is therefore immaterial.

of rectocele, and prolapsing tissue. (*Id.*) Dr. Burke noted the need to rule out postmenopausal uterine bleeding and obtain records from DuPree's prior general surgeon. (*Id.*) Dr. Burke planned for DuPree to start Milk of Magnesia for 14 days, take Motrin, have an ultrasound, and restart a soft diet. (*Id.*) DuPree does not dispute these facts, but faults Dr. Burke for not having obtained a gynecological evaluation by this date. (*See* Dkt. 74 ¶ 37.)

On July 20, 2018, Wexford approved Dr. Burke's request for DuPree to have an offsite gynecological evaluation, a request she had made three days earlier. (*See* Dkt. 59 ¶ 38; *see also* Burke Decl., Dkt. 65 ¶¶ 63, 67.) During the collegial review with Wexford's Dr. Neil Fisher, a plan was made to prioritize a prompt gynecological consultation and go from there. (*Id.*) That same day, Dr. Burke reviewed Dupree's pharmacy records, noted that Nortriptyline could interfere with DuPree's psychiatric medications, and developed a plan to discontinue that medication and change DuPree's Motrin prescription to a Naprosyn prescription, in case that drug was more helpful for DuPree's pain. (*Id.*)

On August 2, 2018, Dr. Burke, who was not on site, received a report from nursing staff that DuPree was in distress from recurrent prolapsed uterus and excessive menstrual bleeding. (*Id.* ¶ 39.) Dr. Burke ordered that DuPree be taken to Northwestern Delnor ER. (*Id.*) DuPree contends, without citation to any evidence, that this ER visit could have been avoided if Dr. Burke had scheduled an earlier gynecological consultation. (*See* Dkt. 74 ¶ 39.)

DuPree reported to the Northwestern Delnor ER staff that she had vaginal bleeding and a prolapsed uterus for five days of mild severity with no abdominal pain, back pain, dizziness, dysuria (painful urination), fatigue, fever, or nausea. (Dkt. 59 ¶ 40.) DuPree further told ER staff that her uterus comes out and she pushes it back in, typically with scant blood, but she had heavy clots on that day. (*Id.*) On examination, the Northwestern doctor found no active bleeding, no

masses, no edema, tenderness, or deformity, but found a few small, dark blood clots. (*Id.*) The ER doctor discussed his findings with the on-call obstetrician and decided there was no need for admission to the hospital or medication. (*Id.*) The doctor recommended an endometrial biopsy to rule out gynecological cancer and completed an abdominal x-ray. (*Id.*) The x-ray found surgical clips were suggested in the upper midline pelvis, and that an early bowel obstruction could not be excluded. (*Id.*)

Dr. Burke saw DuPree for a follow-up on August 3, 2018. (*Id.* ¶ 41.) DuPree complained of poor appetite, uterine bleeding and cramping and some nausea, but no vomiting and good bowel movements. (*Id.*) Dr. Burke noted that an ultrasound in the ER had shown an unremarkable antegrade uterus. (*Id.*) Jail nursing staff also informed Dr. Burke that the ER staff had made a comment about a possible small bowel obstruction, though DuPree denied having additional testing done other than the ultrasound, and the ER did not inform Dr. Burke that an x-ray was done. (*Id.*) A urine dipstick test was performed, which showed the expected blood as the only abnormality. (*Id.*) Dr. Burke's medical assessment was vaginal bleeding, history of rectocele, now with nausea and a little dehydration, and somewhat abnormal bowel sounds. (*Id.* ¶ 42.) Dr. Burke noted the potentially significant role of rectocele and the potential early small bowel obstruction, and further noted that bleeding with clots was unusual because DuPree had not had menses in years. (*Id.*) Dr. Burke's plan of care was to refer DuPree to a gynecologist or urogynecologist and to order a liquid diet for 24 hours and several lab tests. (*Id.*) DuPree's response to the facts from this examination, consistent with her responses to other factual statements regarding her treatment during this time period, is to admit the facts related to Dr. Burke's treatment, but protest that she should have received a referral to an outside gynecologist sooner. (*See* Dkt. 74 ¶ 41.)

That same day, August 3, 2018, Dr. Burke spoke with Dr. Pineiro, a gynecologist, who

agreed to see DuPree. (*Id*. ¶ 43.) Dr. Burke also spoke to Stephanie Myers, Dr. Guske's clinical assistant, who was concerned about a possible small bowel obstruction and recommended certain radiological tests to assess DuPree before making a follow up appointment with Dr. Guske, who had performed DuPree's prior surgery. (*Id.*) In her response, DuPree faults Dr. Burke for failing to obtain these recommended tests, which the medical records describe as an obstructive series or CT to check for a bowel obstruction and a CT of her abdomen and pelvis to assess her prolapse. (Dkt. 74 ¶ 35; *see* Dkt. 68 at 48.)

On August 3, 2018, Dr. Burke drafted a detailed summary of DuPree's current medical history. (Dkt. 59 ¶ 44.) She noted that over the last few weeks, DuPree had developed a pelvic prolapse that was aggravated by straining at stool. (*Id.*) This initially was believed to be a uterine prolapse, but Dr. Burke could not feel a cervix on examination, and DuPree was presenting with predominantly rectal rather than bladder symptoms, but had also developed vaginal bleeding with clots and severe uterine cramping and urinary frequency. (*Id.*) Dr. Burke also noted that DuPree had been seen in the ER for a second time the day before, received fentanyl for her pain, and had a pelvic ultrasound. (*Id.*) Dr. Burke stated that efforts were ongoing to obtain a consultation with the appropriate specialist. (*Id.*)

On August 6, 2018, DuPree had a consultation with Dr. Pineiro, who found a normal examination other than a mild rectocele with no uterine prolapse. (*Id.* ¶ 45.) For her post-menopausal bleeding, an endometrial biopsy was performed. (*Id.*) DuPree was started on Progesterone to control her bleeding. (*Id.*) On August 7, 2018, Dr. Burke spoke with Dr. Pineiro, who reported that the biopsied cervical tissue was very thin, but that the sample was benign. (*Id.* ¶ 46) Dr. Pineiro further reported that the current plan of treatment should be sufficient, but that DuPree might need additional treatment for her bleeding issue after release. (*Id.*)

11

Dr. Burke saw DuPree again on August 13, 2018. (*Id.* ¶ 47.). (*Id.*) On examination, Dr. Burke's assessment was rectocele with a history of severe adhesions. (*Id.*) She noted the benign biopsy results, but that the biopsy was perhaps inadequate, and a formal report from the gynecologist was pending. (*Id.*) The notes indicate DuPree reported considerably less pain than before, but that pain and moderate bowel dysfunction from the rectocele persisted. (*Id.*) Dr. Burke's plan of care was to maintain bowel movements to prevent straining, to check with gynecology to determine whether further tests were needed to rule out endometrial cancer, to try to taper DuPree's Gabapentin dosage from high to moderate, because Gabapentin can be a problematic medication in jails, and to try to reduce DuPree's dosage of Tylenol with codeine because it can cause constipation. (*Id.* ¶ 48.)

2. Dr. Burke Concludes in August 2018 that Surgery was not Urgent and Necessary.

A critical point of contention in this case is Dr. Burke's conclusion that surgery to address DuPree's rectocele was not urgent and necessary, but rather would be elective and could be deferred. Although the precise timing of this conclusion is not explicit in the parties' briefing and supporting materials, Dr. Burke appears to have begun considering the issue in early-mid August 2018. Specifically, the issue appears to have been first broached at DuPree's August 13, 2018 examination, when Dr. Burke had a conversation with DuPree about potential further testing on the rectocele and the possibility of surgery. According to Dr. Burke, she explained to DuPree that Dr. Burke had been advised that DuPree was expected to remain in custody through the end of August into September, and that the timing of her release was important in shaping her treatment plan. (*Id.* ¶ 49.) Dr. Burke explained that, given the chronic, intermittent, and brief nature of DuPree's episodes of prolapse, there was no medical urgency to begin the process of preparation for a potential surgery immediately with her limited time remaining in the jail. (*Id.* ¶ 50.) Even if

12

they did, Dr. Burke noted that DuPree likely could not complete the process before her scheduled release in the coming month. (*Id.*) In terms of further testing, Dr. Burke went on to explain that there was no need for testing for further diagnosis, as a diagnosis had been established, but rather the issue was whether to take steps such as additional tests and consultations for a potential elective surgery, given that the surgery was not urgently needed. (*See id.* ¶49.) Dr. Burke indicates that she explained that either an MRI or CT scan would be needed for an elective surgery, either of which would have to be done off-site. (*Id.*)

DuPree characterizes this conversation on August 13, 2018 differently. She contends that Dr. Burke told her that she needed surgery to get better, and it probably would not happen as long as she was detained because it was too expensive. (*See* Dkt. 74 ¶ 49.) DuPree further disputes Dr. Burke's characterization of the potential surgery as elective, rather than medically necessary. (*See id.*) But as will discussed further below, the only evidence she cites in support of this dispute is her two prior emergency room visits, even though the emergency room treaters did not recommend surgery as a result of their examinations. (*Id.*) DuPree separately disputes Dr. Burke's characterizations of her episodes of prolapse as intermittent and brief, instead asserting that they occurred whenever she was sitting up or walking, and caused considerable pain. (*See* Dkt. 74 ¶ 50.) Again however, she cites to no independent medical evidence for this contention, nor evidence that suggests the frequency of the episodes necessitated urgent surgery.

As to what led to Dr. Burke to tell DuPree that surgery was not urgently need: Dr. Burke states that around the time of this August 13, 2018 examination—she does not provide an exact date—Dr. Burke also consulted with her colleague, Dr. Fisher from Wexford, about the possibility of surgery on DuPree. (Dkt. 59 ¶ 51.) Dr. Fisher relayed that he had consulted by phone with a university colorectal surgeon, who conveyed that doing a second operation for rectocele on a

patient with DuPree's history—specifically her prior rectocele surgery, multiple episodes of bowel obstructions, multiple bowel resections, and known severe adhesion—would be difficult, with a chance of failure perhaps as high as 50 percent, and would pose a high likelihood of prolonged hospitalization. (*Id.*) Dr. Fisher also indicated that the Kane County Sherriff would likely only authorize scheduling a surgery for a detainee who was due to be released in a few weeks if Dr. Burke affirmed that the procedure was urgent and medically necessary, as opposed to elective. (*Id.*)[3]

Dr. Burke states that, based on the considerations provided by Dr. Fisher, she concluded that it was not possible to say that surgery was necessary and urgent prior to DuPree's anticipated release date, given the high chance of failure and the high likelihood of complications. (*Id.* ¶ 52.) Dr. Burke further considered the fact that DuPree had been mostly successful at avoiding episodes by using stool softeners, and had previously acknowledged that she could usually resolve a prolapse episode with manipulation, which was also noted by the ER treaters during her second visit. (*Id.*) Dr. Burke also was aware that DuPree had other abdominal problems, including irritable bowel, gas, and adhesions, such that even successful rectocele surgery would probably not eliminate all of her abdominal and pelvic complaints. (*Id.*) In light of these concerns and Dr. Fisher's note that surgery would only be approved if urgent and medically necessary, Dr. Burke states that she concluded it was a reasonable strategy to postpone offsite testing and consultations regarding elective rectocele surgery. (Dkt. ¶ 53.) In other words, based on DuPree's pattern of

---

[3] DuPree responds to Dr. Burke's statements about her conversation with Dr. Fisher simply by saying that she lacks information to admit or deny the facts. (Dkt. 74 ¶ 51.) The Court could likely deem the facts admitted then based on DuPree's improper response. The Court notes, however, that there would be a potential hearsay (and hearsay within hearsay) issue if the Court were to consider Dr. Fisher's statements, and his statements about what others told him, for the truth of the matter asserted in those statements. See Fed. R. Evid. 801(c)(2). The Court can consider the statements, however, to show their effect on Dr. Burke's decision making and recommended course of action. *See, e.g., Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 430 (7th Cir. 2004) (explaining that a court can consider at summary judgment testimony that would otherwise be hearsay evidence if offered for the truth of the matter asserted if it considers it only for the effect on the listener).

symptoms, Dr. Burke could not conclude that surgery was urgent and necessary rather than elective, and therefore did not recommend proceeding with it. (*Id.*)

In response to Dr. Burke's explanations, DuPree again disputes Dr. Burke's conclusion as to the necessity of surgery, pointing primarily to the fact that Dr. Fisher did not examine DuPree. Dupree also faults Dr. Burke for not performing the CT scan or MRI recommended by Dr. Guske's office before consulting with Dr. Fisher and determining whether surgery was necessary. (*See* Dkt. 74 ¶¶ 52–53; *see also* Dkt. 73 at 4.) Dr. Burke responds by disputing that the tests recommended by Dr. Guske's office were necessary, and further noting that Dr. Pineiro did not recommend imaging. (*See* Dkt. 78 at 4.)

3. Treatment from August 22, 2018, to June 12, 2019.

Dr. Burke asserts that her conclusion that surgery was unnecessary was confirmed when she next saw DuPree on August 22, 2018, because DuPree did not mention any abdominal or pelvic pain and denied any constipation. (Dkt. 59 ¶ 54.) In response, DuPree contends that Dr. Burke did not ask her about her abdominal pain. (*See* Dkt. 74 ¶ 54.) In any event, Dr. Burke addressed DuPree's separate complaints of musculoskeletal pain, and also informed DuPree of further advice received from the gynecologist, Dr. Pineiro. (Dkt. 59 ¶¶54–55.) Specifically, Dr. Burke informed DuPree that Dr. Pineiro had followed up on the biopsy to state that it was "incomplete" but satisfactory in her case, and that she should take six months of Progesterone. (*Id.* ¶ 55.) If bleeding resumed, another biopsy would be performed, with dilation of the cervix. (*Id.*) DuPree contends, without citation to the record, that she did not receive Progesterone. (*See* Dkt. 74 ¶ 55.)

Dr. Burke saw DuPree on three more occasions on August 29, September 12, and October 2018. (*See* Dkt. 59 ¶¶ 56–58.) During these visits, Dr. Burke discussed and treated a number of DuPree's ongoing medical concerns, including her symptoms related to her rectocele, and adjusted

her medication. (*Id.*)

On October 9, 2018, DuPree was discharged from the Kane County Adult Justice Center to Gateway Foundation, a substance abuse treatment center, where she remained for 90 days before moving to a halfway house in Oak Park, Illinois. (*See* Pl.'s Dep., Dkt. 59-1 at 86:1-5; Dkt. 59 ¶ 59.) DuPree returned to Kane County custody on December 14, 2018, however, because she violated the terms of her release. (Pl.'s Dep., Dkt. 59-1 at 86:6–8; *see* Dkt. No. 59 ¶ 59; Dkt. No. 74 ¶ 59.) DuPree contends that she was still under Kane County's authority while she was at the treatment center and halfway house, but points to no evidence in support of this proposition. (*See* Dkt. 74 ¶ 59.) DuPree also notably testified in her deposition that she had no pain or discomfort from the rectocele or prolapse when she returned to the Kane County Adult Justice Center in December 2018. (Dkt. 59 ¶ 60.) DuPree acknowledges her testimony, but also states that she had "intermittent" abdominal pain from uterine prolapse while at the Gateway center and the halfway house. (*See* Dkt. 74 ¶ 60.)

Dr. Burke next saw DuPree on December 19, 2018, at which time DuPree reported that she was doing well and had been doing yoga. (Dkt. No. 59 ¶ 61.) DuPree's rectocele had retracted some and was less troublesome, and there was no more constipation. (*Id.*) Upon examination, DuPree was cheerful and mobile. (*Id.*) Dr. Burke assessed DuPree as having chronic pain syndrome of an uncertain nature, but stated that she was doing well. (*Id.*) Dr. Burke's plan of care was pain control through ibuprofen, psychiatric medications, and yoga/exercise. (*Id.*)

In late January 2019, DuPree again was released from the Kane County Adult Justice Center. (*Id.* ¶ 62.) On January 24, 2019, while on release, DuPree consulted with Dr. Guske and complained of abdominal discomfort and a possible prolapsed rectum. (*Id.*) DuPree reported that the prolapse protruded 2-3 centimeters with difficult bowel movements, but it also self-reduced.

(*Id.*) On examination, the surgeon found that DuPree had a rectocele, but no prolapse. (*Id.*) His assessment was gaseous abdominal distension, gas pain, constipation, rectocele, and anal prolapse. (*Id.*) He prescribed stool softeners and referral to a different colorectal surgeon for recommendations and possible treatment. (*Id.*) DuPree was then reincarcerated at the Kane County Adult Justice Center on February 28, 2019. (*Id.* ¶ 63.)

Dr. Burke next treated DuPree on March 20, 2019, her twentieth consultation with DuPree. (*Id.*) DuPree reported dealing with gastrointestinal difficulties and said that she had rectocele surgery scheduled before her re-arrest. (*Id.*) DuPree denied having severe gastrointestinal symptoms, however, although she complained of indigestion and constipation. (*Id.*) DuPree then saw Dr. Burke three more times in April and early May 2019 regarding various complaints, though none appeared to be directly related to her rectocele. (*Id.* ¶¶64–66.)

On May 17, 2019, DuPree again saw Dr. Burke, and Dr. Burke noted in her records that DuPree had recently filed a grievance about needing rectocele surgery. (*Id.* ¶ 67.) But during the visit, DuPree reported that she was not concerned about the rectocele because the Milk of Magnesia she was receiving was helping to aid her bowel movements and the rectocele was far from her top priority. (*Id.*) DuPree stated that her top priority was her ongoing neck pain and difficulty sleeping due to inadequate neck support. (*Id.*) At this visit, Dr. Burke told DuPree that if she would be incarcerated beyond June 2019, they would discuss referral to a gynecologist in regard to DuPree's vaginal bleeding. (*Id.*)[4] Dr. Burke offered DuPree fiber supplements for her rectocele and constipation, but she refused. (*Id.*)

On June 12, 2019, DuPree came for a follow-up visit related to her vaginal bleeding, which

---

[4] DuPree denies that the records from the May 17, 2019, visit reflect that a follow-up with a gynecologist would be discussed if DuPree was incarcerated beyond June; however, the records do reflect such a note. (*See* Dkt. 74 ¶ 68; *see also* Dkt. 68 at 3.)

she noted was sometimes accompanied by cramps. (*Id.* ¶ 71.) This was Dr. Burke's twenty-sixth and last consultation with DuPree. (*Id.*) DuPree also complained of chronic bowel incontinence due to rectal prolapse, which was a new complaint, as DuPree had previously reported constipation, not incontinence. (*Id.*) DuPree also complained of shortness of breath and chest pressure unrelated to activity, which Dr. Burke noted was unusual for her. (*Id.*) Dr. Burke treated DuPree and planned to follow up on a number of different tests and medication questions, though most appear to be unrelated to DuPree's rectocele. In any event, Dr. Burke would no longer treat DuPree after this point.

### 4. DuPree's Treatment After Leaving Kane County.

On June 20, 2019, DuPree was transferred from Kane County into Illinois Department of Corrections custody. (*Id.* at ¶ 74.) After transfer to IDOC custody, DuPree asserts that her condition continued to worsen and also went untreated by IDOC officials, though DuPree attributes at least part of the delay to the COVID-19 pandemic. (*Id.* ¶ 75; *see* Dkt. 74 ¶ 75.) DuPree eventually had surgery to address her rectocele on June 29, 2021, two years after leaving the Kane County Adult Justice Center. (*Id.*) The Court observes that medical records attached to DuPree's Statement of Additional Material Facts indicate that DuPree had a laparoscopic hysterectomy to treat a uterine prolapse, followed by a later surgery to correct her rectal prolapse. (*See* Dkt. 73 at 61–68.)

### B. Procedural History

DuPree initiated this lawsuit pro se on August 20, 2020. (Dkt. 1.) The Court screened DuPree's original and first amended complaint pursuant to 28 U.S.C. § 1915A, dismissing both for failure to state a claim. (Dkts. 12, 14.) DuPree's second amended complaint, filed on April 4, 2021, passed screening, however, as the Court found it stated a claim for a violation of the Due Process Clause of the Fourteenth Amendment based on DuPree's allegations that Dr. Burke did

not recommend DuPree for surgery because it was too costly. (Dkt. 17.) The parties then proceeded to engage in discovery, which was significantly delayed due to DuPree's incarceration and delays in communication between the parties caused by the COVID-19 pandemic and medical quarantines at DuPree's facility of incarceration. Discovery was eventually completed in 2022 and Defendant's filed their instant motion for summary judgment on November 21, 2022. (Dkt. 56). The motion is fully briefed and ripe for decision.

## Standard of Review

On summary judgment, the Court must view the record in the light most favorable to the non-moving party and grant the motion if the movant "show[s] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021); Fed. R. Civ. P. 56(a). Summary judgment is warranted "against a party who fails to make a showing sufficient to establish the existence of an element that is essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment bears the initial burden of showing the grounds for her motion. *Id.* at 323. Once she has done so, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A factual dispute is genuine when a reasonable jury could return a verdict in favor of the non-moving party. *Id.*

The Court must construe all facts in the light most favorable to the nonmoving party and draw all legitimate inferences in favor of that party. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). "A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead

19

to determine whether there is a genuine issue of triable fact." *Id.*

## Discussion

### I.  Legal Standards

DuPree's operative amended complaint asserts a claim pursuant to 42 U.S.C. § 1983 that Dr. Burke violated DuPree's due process rights under the Fourteenth Amendment by failing to adequately treat her rectocele while she was a pre-trial detainee at Kane County Adult Justice Center[5]. In order to succeed on a claim that jail officials or medical personal violated due process rights of a pretrial detainee in the provision of medical treatment, a plaintiff must show that they had an objectively serious medical condition, and further, that: (1) "the defendant[s] acted purposefully, knowingly, or recklessly when considering the consequences of [their] response to the medical condition at issue in the case"; and (2) "the challenged conduct was objectively unreasonable in light of the totality of the relevant facts and circumstances." *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020); *Williams v. Ortiz*, 937 F.3d 936, 942–43 (7th Cir. 2019) ("Said more succinctly, Williams must demonstrate that genuine issues of material fact exist on two questions: (1) whether he suffered from an objectively serious medical condition and (2) whether the medical staff's response to it was objectively unreasonable."). As to the second element of objective unreasonableness, courts "must view the evidence and gauge objectively, without regard to any subjective belief held by an individual defendant, whether the response 'was reasonable.'" *See Holman v. Triplett*, No. 1:17-CV-4710, 2020 WL 5570039, at *5 (N.D. Ill. Sept. 17, 2020) (citing *McCann v. Ogle Cnty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018)).

Critically, "[m]ere disagreement with a doctor's medical judgment is not enough to establish that a course of medical treatment was objectively unreasonable." *McClendon v.*

---

[5] Although DuPree was subsequently transferred to IDOC custody, her complaints are limited to her pretrial detention at Kane County, and therefore her claims are governed by the Fourteenth Amendment.

*Lochard*, No. 19-CV-373, 2021 WL 3172982, at *8 (N.D. Ill. July 27, 2021) (collecting cases); *Smith v. Kapotas*, No. 18 C 4260, 2020 WL 553619, at *5 (N.D. Ill. Feb. 4, 2020) ("[A] pretrial detainee is not entitled to the treatment of his choice, nor may he state a constitutional claim merely by second-guessing a medical provider's professional judgment."); *see also Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) ("[A]n inmate is not entitled to demand specific [medical] care."). Instead, a plaintiff must point to some evidence in the record demonstrating that the doctor's treatment decisions were "so far afield of accepted professional standards" that a jury could find they were not a product of medical judgment. *See Cashner v. Widup*, No. 17-1079, 2017 WL 11622116, at *3 (7th Cir. Nov. 30, 2017) (citations omitted); *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment.").

## II.    Analysis

In the instant motion for summary judgment, Dr. Burke argues that: (1) DuPree's rectocele was not a serious medical need; (2) Dr. Burke provided objectively reasonable treatment; (3) DuPree lacks verifying medical evidence that Dr. Burke's treatment caused her harm; and (4) DuPree's punitive damages claim fails as a matter of law. The Court will address each issue below. As previewed above, the Court ultimately agrees that Dr. Burke is entitled to summary judgment, because DuPree has failed to create any triable issue of fact as to whether Dr. Burke's treatment was objectively unreasonable, or whether DuPree was harmed by any delay in treatment.

### A. Serious Medical Condition

Dr. Burke first argues that DuPree was not suffering from an objectively serious medical condition. A serious medical condition is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that even a lay person would perceive the need for treatment. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). The condition need not be life-threatening to be serious. *Id.* Rather, a serious medical condition is one that significantly affects the individual's daily activities, or causes chronic and substantial pain. *Hayes v. Snyder*, 546 F.3d 516, 522–23 (7th Cir. 2008).

The Court notes that the parties disagree as to the precise condition from which DuPree was suffering; Dr. Burke describes the condition as rectocele, while DuPree, citing to the diagnosis she received in the Northwestern Delnor ER, contends that she actually had a uterine prolapse that aggravated her rectocele. (*See* Dkt. 72 at 23.) But regardless of the parties' dispute over the correct diagnosis for DuPree's pelvic prolapse, the Court finds that DuPree has brought forth evidence that she was suffering from a serious medical condition.

Dr. Burke argues that the rectocele was not a serious medical condition because it was intermittent and could be reduced (put back into place) by DuPree. But even if that is true, that does not render the condition non-serious. As DuPree notes in her response, her prolapse led to significant bouts of pain and two visits to an emergency room. (*See id.* at 12–13, 23–24.) Further, there is evidence in the record indicating that physicians (including Dr. Burke) recognized DuPree's condition as requiring treatment, and that the physicians themselves recognized that it caused her pain and affected her daily activities. And, of course, DuPree ultimately had surgery to address the condition. There is thus sufficient evidence creating at least a genuine dispute of fact

as to whether DuPree was suffering from an objectively serious medical condition. The Court therefore finds that summary judgment is not proper on this ground.

**B. Whether Dr. Burke's Treatment was Objectively Unreasonable**

Dr. Burke next argues that her treatment of DuPree was objectively reasonable under the circumstances, pointing in particular to: her 26 consultations with DuPree during her time in the Kane County Adult Justice Center; her decision to send DuPree to the emergency room twice when the prolapse presented itself; her prescription and subsequent modification of medications; her attempts to locate DuPree's prior treaters and discuss her condition with them; and the fact that Dr. Burke consulted with a specialist, Dr. Pineiro, who diagnosed DuPree with rectocele, performed a biopsy, and advised that Dr. Burke's treatment plan was sufficient. Dr. Burke argues that her treatment and conclusions were objectively reasonable under the circumstances, and DuPree's criticism of her care amounts to mere disagreement with her treatment decisions, which does not support a constitutional claim. *See Williams*, 937 F.3d at 944 (noting that dissatisfaction or disagreement with course of treatment did not amount to objectively unreasonable medical care).

DuPree makes several arguments in opposition. First, DuPree contends that Dr. Burke "ignored" her diagnosis of uterine prolapse and instead treated her symptoms of rectocele. (*See* Dkt. 72, at 21, 24–31.) But the record does not support a conclusion that Dr. Burke ignored the pelvic prolapse. Rather, Dr. Burke twice directed that DuPree be brought to the emergency room because of these issues. Dr. Burke also provided medication, contacted DuPree's past treaters, obtained approval from Wexford for a consultation with a specialist, Dr. Pineiro, and discussed DuPree's symptoms and diagnosis with Dr. Neil Fisher of Wexford, who himself discussed DuPree's case with a university colorectal surgeon. Like Dr. Burke, Dr. Pineiro did not believe the

prolapse was uterine, instead diagnosing DuPree with mild rectocele with no uterine prolapse. In short, Dr. Burke did not ignore DuPree's medical condition and instead took numerous steps to diagnose and address DuPree's symptoms. DuPree's argument here thus appears to be a mere disagreement with the precise diagnosis of her condition. But if this diagnosis of rectocele was a mistake, and DuPree was suffering both rectocele and a uterine prolapse, as she asserts, it was still incumbent on DuPree to come forward with evidence that the diagnosis and treatment she did receive was objectively unreasonable under the circumstances. But she has failed to offer such evidence, both respect to the diagnosis itself and the treatment she received, particularly given that an independent specialist concurred with Dr. Burke's diagnosis and the course of treatment. *See Gullo v. Sauk Cnty. Jail Med.*, No. 21-cv-86, 2021 WL 1564464, at *2 (W.D. Wis. Apr. 21, 2021) (holding that a misdiagnosis did not violate the Fourteenth Amendment) (citing *Dunigan ex rel. Nyman v. Winnebago Cty.*, 165 F.3d 587, 592 (7th Cir. 1999) (stating that misdiagnosis is "possible evidence of negligence or malpractice," but "does not implicate constitutional concerns")).

Second, DuPree faults Dr. Burke for failing to obtain "specialized CT scans and MRI for the uterine prolapse." (*See* Dkt. 72, at 15–16.) DuPree contends that had Dr. Burke conducted these tests, she "may have discovered that it was the uterine prolapse that was in turn aggravating [her]'s previous rectocele." (*Id.* at 19.) DuPree points to the CT scans recommended by Dr. Guske's clinical assistant to check for a bowel obstruction and assess the prolapse. (*See id.*) But DuPree's speculation that additional testing would have resulted in a faster or different diagnosis does not create a question of fact as to whether Dr. Burke's treatment was objectively reasonable. *See Vogelsberg*, 2022 WL 1154767, at *3 (rejecting a pretrial detainees unsupported assertion that earlier testing would have resulted in a faster diagnosis as nothing more than speculation and mere disagreement with a doctor's chosen course of treatment, which "does not make the treatment

24

objectively unreasonable."). Further, Dr. Guske's suggested testing was not binding on Dr. Burke, particularly given that "jail personnel have latitude in applying outside recommendations in light of the unique challenges and policies only present in a correctional setting." *Summers v. Standiford*, No. 19 C 2978, 2022 WL 3908673, at *5 (N.D. Ill. Aug. 30, 2022) (citing *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) ("There is not one "proper" way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field.")); *see also Scott v. Khan*, No. 20 C 4120, 2022 WL 3576682, at *5 (N.D. Ill. Aug. 19, 2022) ("[A] mere difference of opinion" between medical professionals does not show that correctional doctor's care was inadequate). DuPree speculates that Dr. Burke did not provide Dr. Guske's office with "the proper diagnosis of uterine prolapse" during their telephone consultation, and that Dr. Guske's office might have warned Dr. Burke of the dangers of not repairing the prolapse if she had done so. (*See* Dkt. 72, at 21–22.) But there is nothing in the record that supports this contention, and DuPree's speculation is insufficient to create a question of fact. *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003).

Ultimately it was Dr. Burke, not Dr. Guske, who was DuPree's primary care doctor while she was jailed, and as such Dr. Burke was "free to make an independent medical determination about the necessity of certain treatments or medications" as long as that determination was based on her professional judgment and did not go against accepted professional standards. *McClendon*, 2021 WL 3172982, at *9 (N.D. Ill. July 27, 2021). This includes diagnostic testing like CT scans or an MRI. *See Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) ("An MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is a classic example of a matter for medical judgment.") (cleaned up). The record reflects that Dr. Burke ultimately determined that scans were not necessary to make a diagnosis. While Dr. Burke acknowledges that the scans would have been

necessary for elective surgery, the record further reflects that Dr. Burke decided in August 2018 that surgery for DuPree's prolapse was not medically necessary, given the intermittent nature of her episodes, the fact that DuPree could avoid episodes by using stool softeners, and her ability to resolve an episode with manipulation. Given DuPree's anticipated release date at the time in September 2018, Dr. Burke determined that it did not make sense to go ahead with testing and consultations for an elective surgery when that process likely could not be completed prior to her release, and further when that surgery was not medically necessary.

DuPree nonetheless contends that it was objectively unreasonable for Dr. Burke to determine that further scans and surgery were unnecessary and could not be completed prior to her discharge. DuPree contends, without citation to the record, that she was still in Kane County's custody while at the Gateway Foundation treatment center, and therefore Dr. Burke could have arranged for testing while she was at that facility. She also suggests that Dr. Burke could have recommended that her treatment at Gateway Foundation be delayed while she received testing and treatment for her prolapse. (*See* Dkt. 72 at 30.) But there is no indication in the record that DuPree required urgent treatment at the time she went to Gateway. Nor is there any evidence that Dr. Burke was personally involved in providing treatment for inmates while at Gateway.

As to whether the surgery was necessary, DuPree contends that Dr. Burke told her that the surgery would not happen as long as she was detained because it was too expensive. But even accepting this as true, DuPree is still required to come forward with evidence that Dr. Burke's treatment decisions, and her specific conclusion that surgery would be elective and not medically necessary, were objectively unreasonable in light of the totality of circumstances. *See Voss v. Marathon Cnty.*, No. 18-cv-540, 2021 WL 148732, at \*10 (W.D. Wis. Jan. 15, 2021). In other words, it is not enough to accept DuPree's contention that Dr. Burke said that surgery would be

26

too expensive; rather she must also point to at least some piece of evidence that suggests that *not* having surgery was objectively unreasonable. She has not done so. Specifically, DuPree has not brought forth any evidence from any treater that surgery was medically necessary at the time DuPree was confined at the Kane County Adult Detention Center. DuPree points to her emergency room visits as evidence of the seriousness of the condition, but it is undisputed that treaters at Northwestern Delnor ER decided that hospitalization was not necessary during DuPree's August 3, 2018, visit, and none recommended surgery. Instead, those treaters recommended a biopsy to rule out gynecological cancer, a recommendation that Dr. Burke followed. Additionally, Dr. Burke was told by Dr. Fisher that he consulted with a colorectal surgeon who opined that a second surgery for rectocele was likely to have a high chance of failure and a high likelihood of prolonged hospitalization. Dr. Burke's belief that conservative treatment was appropriate was therefore supported by multiple sources, and was also at least partially supported by the fact that DuPree's symptoms had improved when she returned to jail custody in December 2018. The Court further observes that neither Dr. Pineiro nor Dr. Guske, who examined DuPree in January 2019 when she was out of custody, recommended immediate surgery for her condition.

In short, DuPree's conclusory assertions that she should have received further testing, should have received surgery, and that these tests and procedures could have been completed while she was still in Kane County custody, are unsupported by the record. DuPree's bald assertions are simply insufficient to create any triable issue of fact that Dr. Burke's conclusion that further testing and surgery were not medical necessary was objectively unreasonable.

Finally, DuPree points to an alleged delay in treatment by a gynecologist following her emergency room visits. In her response brief, DuPree points out that her discharge paperwork from Northwestern Delnor ER recommended follow-ups with certain treaters within two days of the

July 14, 2018, visit. (*See* Dkt. 72 at 8; *see* Dkt. 73 at 38.) The record reflects that Dr. Burke requested approval for an offsite gynecological exam from Wexford on July 17, 2018, and received approval three days later. Dr. Pineiro agreed to see DuPree on August 3, 2018, and the visit was conducted three days later on August 6, 2018. DuPree has not brought forth evidence that this timeline was objectively unreasonable under the circumstances.

Delays in treatment that aggravate an injury or needlessly prolong an inmate's pain may violate the Constitution. *See Gomez v. Randle*, 680 F.3d 859, 865–66 (7th Cir. 2012) (holding that a four-day delay in treatment could give rise to actionable deliberate indifference claim where it caused inmate "prolonged, unnecessary pain as a result of a readily treatable condition."). But "the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) (cleaned up); *see also Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016) (en banc) (observing that while "inexplicable delay in treatment which serves no penological purpose" can support a claim, "delays are common in the prison setting with limited resources"); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("Delay is not a factor that is either always, or never, significant.").

In this case, Dr. Burke arranged for a gynecological evaluation within 23 days of DuPree's first trip to the emergency room. There is nothing in the record that suggests that she dragged her feet in this process, or that DuPree required a more immediate evaluation. In any event, minor delays caused by the need to obtain approval for a consultation with a specialist and to locate a specialist do not violate the Constitution. *See Berry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010) ("Anyone who has ever visited a doctor's office knows that some delays in treatment are inevitable, particularly absent a life-threatening emergency. Such delays are even more likely in the prison

environment."). DuPree has thus failed to show that Dr. Burke acted objectively unreasonably in arranging for DuPree's genealogical evaluation.

In sum, while DuPree criticizes various aspects of her care, she has not brought forth evidence that her treatment was "such a significant departure from accepted professional standards or practices that it was objectively unreasonable." *Williams v. Patton*, 761 F. App'x. 593, 597 (7th Cir. 2019) (unpublished) (cleaned up). Rather, the record reflects "persistent and reasoned medical attention" that is inconsistent with unreasonable medical care. *Vogelsberg*, 2022 WL 1154767, at *3 (citing *Williams*, 937 F.3d at 944). In other words, there is insufficient evidence from which any jury could conclude that Dr. Burke's treatment decisions were objectively unreasonable. Dr. Burke is thus entitled to summary judgment.

### C.  Verifying Medical Evidence that any Delay in Treatment Caused Harm

The Court could stop its analysis there, but a few further issues that additionally warrant summary judgment in Dr. Burke's favor are worth addressing. First, many of DuPree's contentions are based on the claim that Dr. Burke's decisions subjected her to an unreasonable delay in treatment. In such a case alleging an unconstitutional delay in treatment, Dupree was obligated to bring forth "verifying medical evidence" that the alleged delays of which she complains caused her "some degree of harm" independent of her underlying condition. *Miranda*, 900 F.3d at 347 (citing *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007) ("In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm."). While expert testimony can be used to demonstrate a delay was harmful, medical records alone can suffice. *Id.*; *see also Walters v. Germaine*, No. 19-cv-763, 2023 WL 2374346, at *3 (S.D. Ill. Mar. 6, 2023) (verifying evidence can include expert opinions,

medical records, treatment notes or physician notes). On the other hand, evidence of diagnosis and treatment, standing alone, is insufficient to meet this requirement for verifying medical evidence if it would not assist a jury in determining whether the delay exacerbated the plaintiff's condition or otherwise caused harm. *Walters*, 2023 WL 2374346, at *3.

Here, the Court concludes that DuPree has failed to come forth with verified medical evidence that the delay in treatment caused her any independent harm or exacerbated her condition. That DuPree's condition progressively got worse and she ultimately had surgery to treat her pelvic organ prolapse, more than two years after leaving the jail's custody for the last time, is insufficient evidence on its own. *See Summers*, 2022 WL 3908673, at *6 (N.D. Ill. Aug. 30, 2022) (stating that the fact that plaintiff eventually had surgery on fractured finger was not evidence that the splint removal of which he complained exacerbated his condition). Rather, it was incumbent on DuPree to point to some medical evidence in the record that would, at the very least, allow the reasonable inference that it was Dr. Burke's decisions— and any alleged delays related to those decisions— that were the cause of DuPree's condition getting worse and ultimately requiring surgery. But while DuPree states in conclusory fashion that she has verifying evidence that Dr. Burke's delay in treatment caused her harm, she does not point to any specific medical record or other evidence in the record supporting this proposition. (*See* Dkt. 72, at 31–34.) "Summary judgment is the 'put up or shut up' moment in a lawsuit." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). In response to Dr. Burke's properly supported motion, DuPree was required to submit evidence setting forth specific facts showing a genuine issue for trial. *Id.* DuPree was required to point to evidence showing a specific harm caused by Dr. Burke's alleged delay in treatment, rather than her underlying condition. She has not done so, so summary judgment is proper on this additional ground as well. *See Sterling v. Wexford Health Sources, Inc.*, No. 16 C 6280, 2021 WL 5906067,

at *7–8 (N.D. Ill. Dec. 13, 2021) (holding that simply pointing to medical records, without setting forth specific injury reflected in those records, was insufficient to create a question of fact as to whether delay in treatment caused harm).

### D. Punitive Damages

Finally, for the sake of completeness, the Court additionally agrees with Dr. Burke's argument that DuPree is not entitled to punitive damages. In a § 1983 action, a jury may be permitted to assess punitive damages "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Green v. Howser*, 942 F.3d 772, 781 (7th Cir. 2019). The assessment of punitive damages requires a determination that the defendant acted with deliberate indifference or reckless disregard. *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 930 (7th Cir. 2004). This is the same standard required for § 1983 liability in the Eighth Amendment context, which is generally a more stringent standard than the objective reasonableness standard under the Fourteenth Amendment. *See id.* Because DuPree has not met the Fourteenth Amendment standard for liability for inadequate medical care, she necessarily has not shown deliberate indifference justifying punitive damages.

*** 

In sum, the Court concludes that Dr. Burke is entitled to summary judgment on DuPree's claims under § 1983. Final judgment will be entered in favor of Dr. Burke. If DuPree wishes to appeal, she must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1)(A). If DuPree seeks leave to proceed *in forma pauperis* on appeal, she must file a motion for leave to proceed *in forma pauperis* in this Court stating the issues she intends

to present on appeal. *See* Fed. R. App. P. 24(a)(1).[6]

**Conclusion**

For the forgoing reasons, Defendant Dr. Burke's motion for summary judgment (Dkt. 58) is granted. The Clerk is directed to enter final judgment for Dr. Burke and against DuPree. Civil case terminated.

**DATE:** March 29, 2024

_____
**Nancy L. Maldonado**
**United States District Judge**

---

[6] DuPree need not bring a motion to reconsider this Court's ruling to preserve her appellate rights. However, if DuPree wishes the Court to reconsider its judgment, she may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).